[Crim. No. 3107.   First Dist., Div. One.   Nov. 14, 1955.]

THE PEOPLE, Respondent, v. GEORGE D. WORKMAN, Appellant.

Thomas B. Gallen for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was tried on three counts: (1) violation of section 288, Penal Code—commission on October 14, 1954, of a lewd and lascivious act upon the person of Virgil, a child of 7 years; count 2, violation of section 286, Penal Code—commission on the same day of sodomy upon the person of the same child; count 3, violation of section 288, Penal Code—commission on October 17, 1954, of a lewd and lascivious act upon the person of Joseph, a child of 9 years. A jury acquitted defendant of count 1 and convicted him of the other counts. Defendant appeals from the judgment and the order denying a new trial.

### QUESTIONS PRESENTED

1. Should testimony of defendant's mother as to the bad reputation of her son James for truth and integrity have been admitted?

2. Alleged misconduct of district attorney

(a) in recalling Virgil in rebuttal;

· (b) in recalling in surrebuttal one of defendant's witnesses to impeach that witness because of conviction of a felony.

## EVIDENCE

Virgil and Joseph are the sons of James Workman. His wife is confined in a state hospital. The boys lived with their grandparents, Mr. and Mrs. James Murphy. Mrs. Murphy is the mother of both James Workman and defendant. Mr. Murphy is their stepfather. James lived in a nearby house. Defendant, therefore, is the brother of James and the uncle of the boys. He lived with the Murphys, occupying a bedroom adjoining that of the boys. In fact to enter his bedroom he was required to pass through the boys' bedroom. Virgil testified to an act of sodomy committed on him the evening of October 14th, in the latter bedroom, and to prior acts. Joseph testified to a similar act on him on October 17th, and to prior acts. The morning of the 18th Joseph reported defendant's acts to his father. Later that day, on being asked, Virgil told of the acts committed on him. Defendant made an equivocal statement to the officers arresting him. On the stand he denied the charges. Mr. and Mrs. Murphy and two friends of the family testified to being in the house the night of October 14th, playing cards in the living room with the Murphys. Defendant came in and out of the living room with frequency, and none of the four noticed anything amiss. James testified that the relations between him and the Murphys and defendant were friendly and that Mrs. Murphy at no time had asked him to remove the children from her home. Defendant and the four witnesses above mentioned testified that Mrs. Murphy had requested James to remove the children and as a result James thereafter evidenced ill feeling towards defendant and the Murphys. One of Joseph's schoolteachers testified that Joseph's reputation for truth was bad. James confronted defendant with the charges made by the boys and was so angry that he threatened to kill defendant with a knife, and would have done so if their mother had not intervened.

With the exception of the equivocal statement of defendant to the arresting officers, the testimony of the boys is uncorroborated. Defendant concedes that their evidence, if believed, and it was by the jury, is sufficient to support the verdicts. He argues, however, that the case being primarily the testimony of the boys against that of defendant, makes the case a close one and hence any error would be prejudicial.

### 1. *Mother's Testimony as to James' Reputation.*

█ Whether a witness is sufficiently qualified to express an opinion on reputation is a matter primarily in the discretion of the trial court, which discretion will not be interfered with on appeal unless an abuse appears. (See 27 Cal.Jur. 131-139; *Khan* v. *Zemansky,* 59 Cal.App. 324, 329 [210 P. 529].) There seems to be a difference in the foundation necessary to prove *good* reputation from that necessary to prove *bad* reputation. █ A witness may base good reputation on the fact that he has never heard anything against the person's reputation. On the other hand, a bad report must of necessity have been discussed generally in the community. (See 1 Wharton's Criminal Evidence, 465-466; vol. V, Wigmore on Evidence, 3d ed., § 1614, pp. 484-486.) █ It has been held that evidence of bad reputation for truth, honesty and integrity is properly excluded where the reputation is confined to the vicinity of the person's place of business or among the members of a restricted group of persons. (*Cosler* v. *Norwood,* 97 Cal.App.2d 665, 667 [218 P.2d 800], witness' knowledge of the person's bad reputation for truth limited to the person's fellow cafeteria workers; *People* v. *Markham,* 64 Cal. 157, 162 [30 P. 620, 49 Am.Rep. 700], witness' knowledge of the person's bad reputation for truth and integrity limited to police officers; *People* v. *Carnavacci,* 119 Cal.App.2d 14, 17 [258 P.2d 1121], witness' knowledge of the person's bad reputation for peace and quiet limited to three or four people who came into the garage where witness worked.) In *People* v. *Markham, supra,* 64 Cal. 157, the court said "to impeach him when the inquiry is as to his reputation for truth, he must have reached the bad eminence of notoriety as a liar." (P. 163.) In *People* v. *Schmidt,* 79 Cal.App 413 [249 P. 832, 250 P. 1104] a witness was permitted to testify as to the person's bad reputation where the witness knew his reputation in the locality where the person did business but did not know it in the locality where the person lived. The court said (pp. 418-419) : "A person in a large city may not be known to his next door neighbor but may be known twenty miles away where he does his business. The former strict ruling on this class of testimony has been relaxed, in view of our modern methods of rapid transit, which enable a person to have his home in one place while he does business in another far away."

█ Volume V, Wigmore on Evidence, 3d ed., p. 488, points out that the old rule of "neighborhood" reputation is not

appropriate to modern conditions, that today, "especially in large cities, a man may have one reputation in the suburb of his residence and another in the office or the factory at his place of work; or he may have one reputation in his place of technical domicile in New York and another in the region of the mines of Michigan or the steel-mills of Ohio where his investments call him for supervision for portions of time. There may be distinct circles of persons, each circle having no relation to the other, and yet each having a reputation based on constant and intimate personal observation of the man."

The latest expression of the California Supreme Court on this subject appears in *People* v. *Cobb,* 45 Cal.2d 158 [287 P.2d 752]. There the character witness was offered to testify to the defendant's good reputation in the neighborhood where the defendant worked although the witness did not know his reputation where the defendant lived. The trial court rejected the offer. The Supreme Court in holding that the trial court erred, stated (p. 192) : "Therefore, it would be illogical to say that reputation evidence should be limited to the community of one's residence to the exclusion of the community of one's place of business; and if it is shown that a general reputation exists in the community of one's place of business, and that the witness has sufficient knowledge of it, the witness should be permitted to testify concerning such general reputation."

We like the language of Mr. Presiding Justice White in his dissenting opinion in the Cobb case (Cal.App.) 279 P.2d 997 (the Supreme Court's decision on hearing we have just stated). After referring to cases which held that reputation in the vicinity of the person's place of business or among a restricted group of persons could not be shown, such as *People* v. *Soules,* 41 Cal.App.2d 298, 306 [106 P.2d 639], and *People* v. *Griner,* 124 Cal. 19, 21-22 [56 P. 625], he stated (p. 55) : "We are persuaded that the true and correct rule is that stated in *People* v. *Derrick,* 85 Cal.App. 406, 409 [259 P. 481], as follows: 'In this age of rapid transit and quick communication it is not only conceivable, but a matter of common knowledge, that business men may acquire no reputation one way or the other in the community in which they actually reside, and bear an excellent reputation miles distant where they follow their daily vocations and come in contact with many associates. (*People* v. *Schmidt,* 79 Cal.App. 413 [249 P. 832, 250 P. 1104] ; see also *State* v. *Henderson,* 29 W.Va. 147

[1 S.E. 225-240] ; *State* v. *Cushing*, 14 Wash. 537 [45 P. 145-147, 53 Am.St.Rep. 883].) Any other view would prevent many eminent citizens from proving well-earned reputations.'" While both the Supreme Court and Mr. Presiding Justice White were considering evidence of *good* reputation, we can see no reason why the same rule would or should not apply to evidence of *bad* reputation.

■ In our case, defendant's mother, Mrs. Murphy, first said she knew her other son, James', reputation for truth and honesty in the community where he lived for the past 16 years and that it was bad. On recross-examination she stated that she had not heard his reputation discussed by the community at large but by his fellow workers. Defendant then asked her if she had discussed his reputation with his circle of friends and the people who came to visit in her home. Objection was sustained to this question, the court holding that the witness had not shown familiarity with James' general reputation in the community. Defendant made no effort to qualify the witness further, and the court struck out Mrs. Murphy's testimony as to James' reputation. The court should have permitted Mrs. Murphy's testimony to stand. James' reputation among his fellow workers would be in line with modern conditions. Mrs. Murphy should have been permitted to show that added to that there was a like reputation among his circle of friends and the people who visited at their home.

However, under the circumstances of this case we do not feel that the error was prejudicial. The prosecution's case did not, in any material degree, depend upon his testimony. (Const., art. VI, § 4½.)

2. *District Attorney.*

■ (a) At the close of defendant's case, Virgil was recalled in rebuttal. He testified briefly to some matters to which he had already testified. Defendant contends Virgil was recalled merely to appeal to the sympathy of the jury, by showing again "a little boy whose family situation—completely apart from the issues on trial—cried aloud for that sympathy." Defendant at no time objected to the recalling of Virgil, nor to any of his testimony. While the testimony was merely repetitious, and could have been ruled out on objection, we see no misconduct in the act of the district attorney. There was a time element which was important in the case and which the district attorney apparently wanted to narrow down.

■ (b) James Murphy, stepfather of defendant and James Workman, testified for the defense, and was not cross-exam-

ined by plaintiff. After defendant rested his case, plaintiff recalled Murphy and asked him if he had ever been convicted of a felony. He replied that he had. Thereupon defendant objected on the ground that this was not proper surrebuttal and that plaintiff could not impeach its own witness. The court struck out the answer and instructed the jury to disregard it. Defendant assigns the asking of this question as misconduct. While it is true it was not surrebuttal, nevertheless the question could have been asked on cross-examination, and had plaintiff asked permission to recall the witness for cross-examination instead of calling it surrebuttal, it would have been in the discretion of the trial court to have allowed plaintiff to do so, even though it was at the end of the case. Moreover, plaintiff was not attempting to impeach its witness. Murphy was defendant's witness. (See *People* v. *McFarlane*, 134 Cal. 618, 620 [66 P. 865, 67 P. 138].) There was no misconduct here.

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.